No. 24,668.

LONGTON STATE BANK, *Appellee*, v. S. MURPHY, *Appellant.*

SYLLABUS BY THE COURT.

1. ORAL PROMISE—*By Father to Pay Moneys to Be Advanced to His Son— Issue—Was the Promise a Primary and Valid Obligation of the Father?— Evidence—Findings.* The record examined and held to contain sufficient evidence of an oral agreement between plaintiff bank and defendant to require a submission to a jury of the question whether moneys advanced to defendant's son created an independent, primary and valid obligation binding on the father, or whether the father's obligation was merely an oral promise to answer for the debt of his son and void under the statute of frauds.

2. SAME—*No Error in the Record.* The instructions given and refused examined and no error discerned therein.

Appeal from Elk district court; ALLISON T. AYRES, judge. Opinion filed February 9, 1924. Affirmed.

*Thomas E. Wagstaff*, of Independence, and *C. B. Crawley*, of Howard, for the appellant.

*A. F. Sims*, of Howard, and *S. H. Piper*, of Independence, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff bank sued the defendant, S. Murphy, for certain moneys advanced to C. L. Murphy, a son of the defendant, pursuant to an alleged oral agreement between plaintiff and defendant.

In behalf of the bank, the evidence tended to show that defendant is a man of substantial means, a stockholder and director of the

plaintiff bank, and was for some time its vice president. In 1913, C. L. Murphy, son of the defendant, was a young man of small means, recently married; and his father was ambitious that the son should expand his business activities as a farmer. So the father called on the bank cashier and said to him:

"My son is going to move from the place where he now lives and take a larger place, and he will make larger investments and needs more money. I would like to have you furnish him with money that he may need and take security for it so far as you can and I will keep in touch with it and I will— I want to know about what he is getting and I will pay it if required to. If the bank wants their money they can have, but I want him to learn to do business, and I don't want to be known in the transaction. I don't want him to know, but I will keep in touch with it and take care of it if required to do so."

The bank assented to this proposition and began to let the son, C. L. Murphy, have various sums of money. As the years passed, the son's business expanded and his need for greater sums increased. The bank advanced such sums as he required, usually taking such security as the young man could give. Sometimes the sums advanced aggregated as high as $3,500. The father one time cautioned the bank that it was furnishing the young man too much money. At another time he induced the cashier to go to another bank and buy an indebtedness which the son had incurred. At various times the indebtedness of the son was reduced by payments, but at no time between 1913 and the commencement of this action was the account fully paid or closed. The balance here sued on was evidenced by a note of C. L. Murphy for $1,976.36. From time to time, when the account between the bank and the son was the subject of question or discussion by the bank examiner or in meetings of the bank directors, the defendant Murphy was accustomed to say of the account, note or notes of the son, that any time the bank wanted its money it could have it. These assurances were not always expressed the same way. Sometimes the father's language was susceptible of an interpretation that he was merely a surety or guarantor for his son's indebtedness. Once a bank examiner, looking over the notes of the bank, came to certain notes of the son and said: "Who is C. L. Murphy?" The defendant said: "He is my son. I will guarantee the bank will never lose a dollar on him." On another occasion, when bank officials went to look at C. L. Murphy's cattle, on which the bank had a chattel mortgage, they were talking of the best time to sell, and the son was asking for further time in the

hope the cattle would sell for more money later, the defendant father said: "Let the boy keep the cattle, and when the bank wants the money I will see that they get it." On another occasion the cashier called defendant's attention to the growing size of the amounts advanced to the son. The cashier said:

"'That's a good deal of money for a lad like him to handle,' and Smith Murphy [defendant] replied, 'Do you think I am good for it?' and the cashier said 'You sure are,' and Smith Murphy said, 'Charlie, don't lose any sleep; I will see that every dollar of it is paid.'"

The time came when the bank needed its money. To the son the bank wrote:

"We desire to state that your note for $1,967.36 made for 6 mo. and dated Oct. 2, 1920, falls due on Apr. 2, 1921. The interest for six months at 8% is $78.69 which together with the principal amounts to $2,046.05 for the payment of which amount we demand payment on the date of maturity."

To the defendant, the bank wrote:

"We desire to state that C. L. Murphy's note for $1,967.36 made for 6 mo. and dated Oct. 2, 1920, falls due on Apr. 2, 1921. The interest for six months at 8% is $78.69, which together with the principal amounts to $2,046.05. As this is the closing of C. L. Murphy's account with us, the payment of which you guaranteed to us, we demand payment of $2,046.05 on the maturity date."

Defendant demurred, raising the statute of limitations and the statute of frauds. This being overruled, he answered with general and specific denials of all the material allegations of plaintiff's petition, and invoked the statute of frauds.

Jury trial, verdict, and judgment for plaintiff.

Defendant assigns various errors, contending first that the demurrer to the plaintiff's evidence should have been sustained. From the excerpts of the testimony quoted above, it seems clear to us that there was a question for the jury's consideration which could not be cut off by a demurrer to the evidence. It was fairly established, by part of the evidence at least, that the moneys furnished from time to time to the son were advanced pursuant to the arrangement effected between the cashier and the defendant. The only complication which clouds this transaction as the obligation of Murphy, senior, was the private understanding between the cashier and defendant that the formula of loaning to the son, taking his notes, taking security from the son, dealing with him as an ordinary customer and borrower, should be ostensibly carried through as in ordinary banking transactions. There was an excellent reason for this. Murphy, senior, was a man of means; he was naturally

solicitous that his son should branch out into business, and learn the financial responsibilities of a business man—how to borrow money, to give security, and learn to meet his obligations. The father wanted the bank to coöperate in this matter of the son's business education. The cashier agreed to this. But of course the bank could not prudently loan money in considerable sums to a youth just coming of age, without means, without business experience and without having demonstrated his business sagacity, and look primarily and exclusively to the son to make good on such extensive financial undertakings. So the evidential circumstances as a whole, together with the testimony in the bank's behalf, and notwithstanding the positive testimony of defendant to the contrary, justified the overruling of the demurrer.

In *Ezell v. Butcher*, 104 Kan. 465, 466, 179 Pac. 332, it was said:

"The statement that the defendant said she would pay for the goods, if her daughter would not, of course tended to indicate a collateral rather than an original obligation; but the plaintiff is not absolutely bound by the testimony of any witness other than herself. Her own use of the word 'guarantee' might seem to have a similar tendency, but a witness, although a party, is not necessarily to be regarded as having used words in their strict legal sense. The test is whether the promise was in fact made and intended as collateral or original, the mere form of its expression not being controlling. (29 A. & E. Encycl. of L. 906-908; Notes, 15 L. R. A., n. s., 216; 31 Ann. Cas. 490; 36 Ann. Cas. 257, 258.)" (See, also, *Martin v. Bell,* 110 Kan. 192, 203 Pac. 691.)

Counsel cite section 3 of the negotiable instruments act (R. S. 52-103) which declares that the person primarily liable on an instrument is the person who by its terms is absolutely bound to pay it. But this contention is irrelevant here. Of course, in an ordinary action on the instrument, C. L. Murphy, the maker, could not be heard to say that he was not primarily liable; he could not plead some extraneous obligation not incorporated therein. But this action has little concern with the note of C. L. Murphy. The taking of that note by the bank was merely in accord with its agreement with Murphy, senior, to coöperate with him in his plan for the business education of his son, for all of which, and for the method and consequences of which, Murphy, senior, originally and primarily obligated himself—if the testimony for the bank was true, and that was a jury question.

Much fault is found with the trial court's instructions, but a careful examination of them shows that the law of the case was correctly stated and the defense thereto was properly defined. These are too

23—115 Kan.

long for reproduction in full, but pertinent and typical ones, in part, read:

"*7a.* If you should find from the evidence in this case that the defendant said to the plaintiff or some of its officers in substance: 'If you will loan to my son whatever he may request and I will pay you' and the bank in pursuance of said request and promise to pay, did let the son have loans from time to time and the amount sued for is the result of these loans, then the defendant would be liable for its payment, since that would be creating a primary liability of his own, and would not have to be in writing, but if you should find that the defendant said to the bank or its officers in substance: 'If you will loan to my son whatever funds he may need or desire to use in his business, I will see that it is paid, or, I will guarantee its payment, or I will see that he pays you,' that would be a promise on the part of the defendant, collateral to that of the son, and would have to be in writing before the defendant could be held upon it, and not being in writing, he would not be liable.

"*7b.* If you should find from the evidence that after the indebtedness had been created between the bank and C. L. Murphy, the defendant said to the bank or some of its officers that he would pay same, or said that in substance, such would not create a liability against him it being a promise to pay the debt of another and the bank could not recover on that promise, same not being in writing.

"8. In determining liability in a case of this character an important question to consider is: To whom was the credit given? If to the promisor alone, his promise need not be in writing; but if given to a third person to any extent, and the promise is collateral to the liability of such third person, then it must be in writing. . . .

"9. If the contract or promise to pay, if any, made by the defendant, was binding on him in the first instance, and at all events, then he would be liable, but if only binding upon him in the case the son did not pay, he would not be liable. . . .

"14. If, from the evidence, you find that the relation of the defendant to the loans made by the plaintiff to C. L. Murphy, if they were made to C. L. Murphy, was that of only a guarantor or surety, the plaintiff cannot recover.

. . . . . . . . . . . . . . . . .

"16. You are instructed that the fact that the defendant, S. Murphy, was himself one of the directors and the vice president of plaintiff bank, at the time the money in controversy was loaned by the bank had nothing whatever to do with your verdict in this case and ought not to influence you one way or the other in arriving at your verdict."

These instructions are in harmony with *Ezell v. Butcher,* supra, and with the general run of decided cases, including the instructive note to *Mankin v. Jones,* 63 W. Va. 373, in 15 L. R. A., n. s., 214, 227. On the latter page it is said:

"A very strong piece of evidence against the promisee in an action by him to hold the promisor on his promise to answer for the debt, default, or mis-

State Bank v. Murphy.

carriage of another, is the fact that the promisee has kept a book account of the transaction, and has therein charged the account to the debtor rather than to the promisor, or has charged the account to the debtor as the original debtor, and to the promisor as his surety merely. While this is strong evidence that the promisee did not intend to look to the promisor in the first instance for payment, but rather intended to look to him as a surety, yet it may be rebutted by explanation, such as of custom or usage to make a charge in that way, even though credit was originally given to the promisor, or that the charge was made in this manner at the request of the promisor.

"Usually the whole question as to the intention of the parties in making such a promise is one of fact, which should be submitted to the jury for their determination."

The next error urged relates to the refusal of defendant's requested instructions. These were framed on the theory that the statute of frauds barred recovery, and so, too, the statute of limitations. In view of what has been said, the statute of frauds and its consequences were properly treated in the court's instructions; and if the original oral obligation of defendant made in 1913 was established in the jury's satisfaction under proper instructions there was nothing transpired thereafter which would set in motion the statute of limitations. If the original arrangement between the cashier and defendant was ever effected, it certainly was repeatedly affirmed from time to time by defendant thereafter, and was never terminated nor repudiated until shortly before this action was begun.

Error is also based on the submission of the cause to a jury, and in overruling defendant's motion for a new trial, but these assignments require no discussion. The record discloses no prejudicial error; consequently the judgment is affirmed.